Filed 2/25/14  P. v. Jones CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C074090 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F06525) |
| v. | |
| ERICK ARNOLD JONES, | |
| Defendant and Appellant. | |

A jury found defendant Erick Arnold Jones guilty of attempted willful, premeditated, and deliberate murder, and assault with a deadly weapon, and found in connection with both counts that he personally used a deadly and dangerous weapon, to wit, a knife, and personally inflicted great bodily injury.  In bifurcated proceedings, the trial court found that defendant had sustained four strike priors and three prior serious felony convictions.

1

Sentenced to state prison, defendant appeals contending insufficient evidence supports the jury's finding made in connection with the attempted murder that he acted with premeditation and deliberation. We disagree and affirm.

FACTS

*Prosecution Case*

On September 22, 2011, Cheisa McElroy called the clothing store where she worked to report that she would be late. She spoke with Tyrone Ford, the assistant manager, who she had previously dated. Ford told McElroy that her tardiness was a regular occurrence and suggested that someone else should work her shift. McElroy became upset and started arguing. Ford hung up on her because he did not want to argue. Defendant, McElroy's boyfriend, overheard the conversation. McElroy called back and complained to Ford that he had been rude and had "disrespected" her. Ford hung up again, saying he did not want to argue. McElroy called back again and spoke to a coworker, Romena Bozart, and complained about Ford. Bozart heard defendant in the background saying, " 'I'm just fucking tired of him disrespecting my girl.' " Bozart told McElroy that Ford had not "disrespected" her.

About 1:00 p.m., McElroy arrived at work. Between 1:27 p.m. and 3:45 p.m., McElroy and defendant called one another a combined 23 times and talked for a total of about 45 minutes on the phone. At 3:03 p.m., defendant texted McElroy, " 'Get ready to C WT real love does. I love U, Cheese.' "

About 4:00 p.m., defendant went to, but not in, the clothing store, taking McElroy's five-year-old daughter with him. McElroy went outside the store and her daughter went inside with Bozart. Meanwhile Ford went to the nearby grocery store. While Ford was inside the grocery store, he saw defendant, appearing to be agitated, walk back and forth outside the store. Five to 10 minutes later, defendant motioned to Ford to come outside. Ford hoped to "clear the air" about his lack of relationship with McElroy. Ford approached defendant who seemed angry and upset and said, "What's up?"

2

Defendant, armed with a knife, lunged at Ford and stabbed him in the stomach. Ford threw a punch at defendant. Defendant stabbed Ford several more times. Ford raised his arms to protect himself and went backwards. Defendant stabbed Ford in the chest. When Ford fell to the ground in front of a restaurant, defendant continued to stab Ford who was crossing his arms and raising his legs to protect his body. Bozart saw defendant stab Ford five or six times while Ford was on the ground. Ford was screaming. He thought he was going to die. When Ford became silent, defendant walked away. Bozart thought Ford was dead and called 911.

Ford managed to get up, walked back to the clothing store, leaving a trail of blood, and collapsed inside. Customers used clothing to stop the bleeding. An ambulance took Ford to the hospital.

About 4:10 p.m., deputy sheriffs arrived and arrested defendant in front of the clothing store. Defendant did not have any injuries on his face, torso, or limbs. He had a small bandage covering a prior injury on his right ring finger. He had blood on his pants and shoes. McElroy ran away with the knife but deputies commanded her to drop the knife and she eventually did so.

Ford was hospitalized for several days. He had 13 stab wounds including several defensive wounds to his arms and legs. He had a stab wound to his lung, requiring a drainage tube, and a stab wound to his stomach causing a hernia and requiring internal stitches. He suffered severed tendons in his thumb, requiring a second surgery. Ford's mother cared for him for a week after he was released from the hospital. He missed several months of work.

*Defense Case*

An owner of the grocery store testified that for five or 10 minutes before the stabbing, Ford was inside the market and did not seem nervous. The owner did not see anyone walking back and forth outside the store. Another clothing store employee thought Ford looked "mad" after he received phone calls from McElroy.

3

McElroy testified she began working at the clothing store in 2003 and had a sexual relationship with Ford. When that relationship ended, they both started dating others. McElroy explained that when Ford was promoted to assistant manager, he became "real arrogant . . . almost like a bully." When McElroy started dating defendant, Ford made inappropriate remarks and gestures toward her which she reported to defendant.

McElroy said that on the day of the stabbing, when she called in about being late, Ford told her that she was " 'always late' " and hung up. She called back and told Ford he was rude and he did not like being told that. She called again to talk to the manager but he had not arrived at the store so McElroy spoke with Bozart. When McElroy arrived at the store, she spoke to the manager who told her that she needed to apologize for disrupting the workplace. McElroy claimed that she and defendant had an evening to themselves as her daughter would be watched by the child's father. When defendant arrived, McElroy said she greeted him outside. Defendant then walked away. When Ford came out of the grocery store, Ford approached defendant and immediately hit defendant in the face. McElroy went to the clothing store to get help and when she returned, she saw defendant push Ford, telling him to leave McElroy alone. Ford swung at defendant again and they started fighting in front of the restaurant. After the fight, during which she never saw defendant stab Ford, McElroy picked up the knife and walked away. During a jail phone call between McElroy and defendant five days after the stabbing, McElroy said, " '[Y]ou did not have to do what you did.' "

Defendant testified and admitted that he overhead the call between McElroy and Ford after which defendant advised McElroy to call back and talk to the manager. Defendant denied that he was angry. Defendant said he planned a romantic evening with McElroy. He and McElroy's daughter rode the bus to the store. Defendant did not enter the store because he did not want to encounter Ford. After greeting McElroy outside the store, defendant walked toward the restaurant and on the way, saw Ford inside the grocery store. Defendant claimed that when Ford saw defendant, Ford went outside.

4

Defendant said he pulled out a knife that he had clipped to his pants, expecting to fight and claimed he could not defend himself unarmed because of the cut on his finger and the fact that Ford was younger and taller. When Ford approached, he stood in a boxing stance, and asked what was going on. Defendant interpreted Ford's conduct as an invitation to fight. Defendant claimed Ford hit him (defendant) "solid" in the face. Although defendant claimed he aimed for Ford's leg or butt, defendant then stabbed Ford in the stomach. When Ford grabbed defendant's shirt, defendant stabbed Ford's hand. Ford lost his footing and fell on the ground with defendant on top. Defendant said he tried to get up but Ford kicked him in the chest. Defendant then stabbed Ford in the leg. When Ford stopped kicking, defendant stood over Ford and then sat down to catch his breath. Defendant then looked toward the clothing store for McElroy but did not see her. He then walked away from the stores into the parking lot. Defendant said he took his shirt off because it was hot and set the knife down. He returned to the area of the clothing store, got on the ground, and waited for the police.

Defendant denied that he intended to kill Ford, saying he had tried to avoid Ford. Defendant said his text message to McElroy referred to his plan for a romantic evening. Defendant admitted convictions for dissuading a witness in 1991; robbery in 1992; false imprisonment, dissuading a witness and robbery in 1995; and misdemeanor domestic assault in 1995. Defendant admitted having sustained no bruises from the fight with Ford, he knew that Ford was unarmed, and knew that stab wounds could lead to Ford's death. In a taped phone call with "Angel," defendant claimed Ford threw one punch but missed.

## DISCUSSION

Defendant argues there was insufficient evidence to establish that the attempted murder was deliberate and premeditated. The argument lacks merit.

In reviewing a sufficiency of the evidence claim, we review the evidence in the light most favorable to the judgment to determine whether there is substantial evidence

such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Carter* (2005) 36 Cal.4th 1114, 1156.) We presume the existence of every fact in support of the judgment that the jury could reasonably deduce from the evidence. (*Ibid.*) In reviewing the sufficiency of the evidence of premeditation and deliberation, we consider the evidence of planning, motive, and manner of killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*).)

" ' "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation . . . does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citations.]" ' [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419; see *People v. Vorise* (1999) 72 Cal.App.4th 312, 318.)

Defendant contends the evidence fails to show the required reflection for a cold and calculated offense but instead showed an "unconsidered" and "rash" explosion of violence. Defendant argues the method of attack was nothing like an execution-style killing but then concedes that the manner of killing need not be an execution-style act. Because defendant stopped stabbing even though he could have continued and killed Ford, defendant argues this shows the lack of premeditation. He also argues there was no evidence of planning the attack or a motive to kill. He claims that the three types of evidence listed in *Anderson* are insufficient. (*Anderson, supra*, 70 Cal.2d at p. 15.)

*Anderson* considered the types of circumstantial evidence that can support a finding of premeditation for a first degree murder conviction and explained that planning, motive, and manner of the killing can sustain a finding of premeditated murder. (*Anderson, supra,* 70 Cal.2d at pp. 25-26.) However, *Anderson* was "intended only as a framework to aid appellate review." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) *Perez* explained, "In identifying categories of evidence bearing on premeditation and

6

deliberation, *Anderson* did not purport to establish an exhaustive list that would exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation. . . . The *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*Ibid.*; *People v. Elliot* (2005) 37 Cal.4th 453, 470-471; *People v. Combs* (2004) 34 Cal.4th 821, 850.)

Here, there was ample evidence defendant planned to kill Ford to retaliate for Ford's treatment of McElroy, defendant's girlfriend. Defendant was tired of Ford "disrespecting his girl." Prior to the stabbing, defendant and McElroy conversed by phone for 45 minutes in 23 phone calls. About an hour before the attack, defendant texted McElroy that she should "get ready to see what real love does." Defendant, angry about the phone call between McElroy and Ford and Ford's perceived disrespect, armed himself with a knife clipping it to his pants, left home, and went by bus to the clothing store. For five to 10 minutes, defendant walked back and forth in front of the nearby grocery store where Ford was located, motioned to Ford, and waited for Ford to exit the store. As soon as Ford went outside the store, and without provocation, defendant lunged at Ford with the knife, stabbing him in the stomach. Defendant continued his vicious knife attack, striking the defenseless Ford in the chest, arms, and legs, and continued his attack after Ford fell to the ground where Ford, who was screaming, put up his arms and legs to protect his body. Only when Ford stopped screaming did defendant end his attack. Bozart thought Ford was dead. The jury could infer that defendant thought so too. Defendant stabbed Ford 13 times. Ford required hospitalization for several days and two surgeries. He sustained a stab wound in the chest which punctured his lung and a stab wound in his stomach. Defendant's planning and the nature of the attack provided the jury with sufficient evidence to find that defendant acted with premeditation and deliberation.

DISPOSITION

The judgment is affirmed.


                 _____ROBIE_____, J.


We concur:


_____HULL_____, Acting P. J.


_____HOCH_____, J.

8